ACCEPTED
12-14-00323-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
6/8/2015 8:38:00 PM
CATHY LUSK
CLERK

**No. 12-14-00323-CV**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
6/8/2015 8:38:00 PM
CATHY S. LUSK
Clerk

# In the Twelfth Court of Appeals
# Tyler, Texas

**David Tubb and Superior Shooting System, Inc.,
Appellants**

**v.**

**Aspect International, Inc. and James Sterling
Appellees**

# Appellants' Brief

Wesley Hill
Bar No. 24032294
Ward, Smith & Hill, PLLC
P. O. Box 1231
Longview, Texas 75606
Telephone: 903-757-6400
Facsimile: 903-757-2323

Greg Smith
Bar No. 18600600
Ramey & Flock, P. C.
100 E. Ferguson, Suite 500
Tyler, Texas 75702
Telephone: 903-597-3301
Facsimile: 903-507-2413

**Attorneys for Appellants**

*Oral Argument Requested*

**Statement Regarding Oral Argument**

Oral argument is appropriate. The outcome below is novel, indeed surprising. On liability, the trial court found that Superior repudiated the parties' venture despite its consistently voiced intent to perform and notwithstanding Aspect's confession that Superior's intent appeared genuine. As relief, Aspect has been granted a substantial sum in "restitution" even though there is no evidence it is any worse off—or Superior is any better off—than before the venture. The Court would benefit from the chance to ask questions probing this outcome.

**The Parties and Their Counsel**

**I.  Appellants:**

David Tubb
Superior Shooting System, Inc.

**II.  Appellees:**

Aspect International, Inc.
James Sterling

**III.  Counsel for Appellants:**

Gregory D. Smith
Nolan Smith
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, TX 75702
Telephone: (903) 597-3301
Facsimile:  (903) 597-2413
gregs@rameyflock.com
nolans@rameyflock.com

Wesley Hill
Texas Bar No. 24032294
Ward, Smith & Hill, PLLC
P. O. Box 1231
Longview, Texas 75606
Telephone:  903-757-6400
Facsimile:    903-757-2323
wh@wsfirm.com

**IV.     Counsel for Appellees:**

M. Keith Dollahite
M. Keith Dollahite, P.C.
5457 Donnybrook Ave.
Tyler, Texas 75703
Telephone: 903-581-2110
Facsimile:   903-581-2113
keith@mkdlaw.us

Trey Yarbrough
Yarbrough Wilcox, PLLC
100 E. Ferguson, Suite 1015
Tyler, Texas 75702
Telephone: 903-595-3111
Facsimile:   903-595-0191
trey@yw-lawfirm.com

 /s/ Gregory D. Smith
GREGORY D. SMITH

## CONTENTS

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Identity of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.  There is no evidence Superior repudiated the executory
    contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A. In Texas, repudiation requires a contract's fixed and
       unequivocal renunciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B. Superior didn't make any fixed and unequivocal
       renunciation of the venture . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       1. Aspect relied on speculative conclusions . . . . . . . . . . . . . 13

       2. Superior's actions were the opposite of
          repudiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          a. Tubb's comments about moving the
             manufacturing location were no repudiation . . . . . . 15

          b.    Superior never intentionally withheld supplies  .... 22

     3.    Both parties were negotiating towards a written
          contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

  C.  It was Aspect that chose to get out of the contract . . . . . . . . . . 32

II.    There is no evidence supporting Aspect's damage recovery  . . . . . 35

  A.  Aspect has no basis to recover for Sterling's time . . . . . . . . . . 35

     1.    Because the venture was a partnership, Sterling's
          time is not compensable . . . . . . . . . . . . . . . . . . . . . . . . . 35

     2.    There was no probative evidence quantifying any
          benefit to be restored . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  B.  Sterling's damage proof was inadmissible, was not
     probative, and did not show a complete damage calculation . . 39

  C.  Aspect could have mitigated any damage  . . . . . . . . . . . . . . . 42

  D.  When Aspect left the venture, it was no worse off
     than when it began  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  E.  The recovery is excessive . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

III.   Aspect owes attorney's fees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Conclusion and Prayer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Certificate of Service  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Certificate of Compliance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Appendices:

A. Findings of Fact and Conclusions of Law
B. Final Judgment

# AUTHORITIES

**CASES:**

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136
  S.W.3d 227 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Davis v. Canyon Creek Estates HOA*, 350 S.W.3d 301
  (Tex.App.–San Antonio 2011, pet. denied) . . . . . . . . . . . . . . . . . . 12

*Dora v. Mullick*, 2000 WL 33322942, (Tex.App.--
  Texarkana 2001, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dudley v. Born*, 710 S.W.2d 638 (Tex.App.–Beaumont 1986,
  writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ennis Business Forms, Inc. v. Gehrig*, 534 S.W.2d 183
  (Tex.Civ.App.–Waco 1976, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . 11

*Glass v. Anderson*, 596 S.W.2d 507 (Tex. 1980) . . . . . . . . . . . . . . . . . . 18

*G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d
  537 (Tex.App.–Dallas 2005, no pet.) . . . . . . . . . . . . . . . . . . . . . . . 48

*Green Int'l v. Solis*, 951 S.W.2d 384 (Tex. 1997) . . . . . . . . . . . . . . . . . . 47

*Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707 (Tex. 1982) . . . . . . . . . 21

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*,
  443 S.W.3d 820 (Tex. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ingram v. Deere*, 288 S.W.3d 886 (Tex. 2009) . . . . . . . . . . . . . . . . . . . . 37

*Kaiser v. Northwest Shopping Center, Inc.*, 587 S.W.2d 454
  (Tex.Civ.App.–Dallas 1979, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . 20

*Kilgore v. Northwest Texas Baptist Educational Society*, 37 S.W. 598 (Tex. 1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Litton Indus. Prods. v. Gammage*, 668 S.W.2d 319 (Tex. 1984) . . . . . . . 23

*McKenzie v. Farr*, 541 S.W.2d 879 (Tex.Civ.App.–Beaumont 1976, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McKinley v. Drozd*, 685 S.W.2d 7 (Tex. 1985) . . . . . . . . . . . . . . . . . . . . . 47

*Preston v. Love*, 240 S.W.2d 486 (Tex.Civ.App.–Austin 1951, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ravkind v. Ravkind*, 1995 WL 458856 (Tex.App.–Houston [14th Dist.] Aug. 3, 1995, writ denied) . . . . . . . . . . . . . . . . . . . . . . . 19

*Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148 (5th Cir. 1981) . . . . . 11, 28

*Smith v. Patrick W. Y. Tam Trust*, 296 S.W.3d 545 (Tex. 2009) . . . . . . . 48

*Stanley Manly Boys' Clothes, Inc. v. Hickey*, 259 S.W. 160 (Tex. 1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Thomas v. Bobby D. Assoc.*, 2008 WL 3020339 (Tex.App.–Tyler 2008, no pet.(mem.op.) . . . . . . . . . . . . . . . . . . . . 47

*Townewest HOA v. Warner Communications, Inc.*, 826 S.W.2d 638 (Tex.App.–Houston [14th Dist.] 1992, no pet.) . . . . . . . . . . . . 20

*Whirlpool Corp. v. Camacho*, 298 S.W.3d 631 (Tex. 2009) . . . . . . . . . . . 41

**RULES, STATUTES AND OTHER AUTHORITIES:**

Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 TEX. L. REV. 359 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

RESTATEMENT OF CONTRACTS § 317(2) . . . . . . . . . . . . . . . . . . . . . . . . 20

RESTATEMENT (SECOND) OF CONTRACTS § 278(1) . . . . . . . . . . . . . . . . . . 18

RESTATEMENT (SECOND) OF CONTRACTS § 344 . . . . . . . . . . . . . . . . . . . . 38

TEX. BUS. ORG. CODE § 152.203(c) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

TEX. BUS. ORG. CODE ANN. § 152.051(b) . . . . . . . . . . . . . . . . . . . . . . . 36

TEX. BUS. ORG. CODE ANN. § 152.202 . . . . . . . . . . . . . . . . . . . . . . . 35, 36

TEX. CIV. PRAC. & REM. CODE § 38.001 . . . . . . . . . . . . . . . . . . . . . . . 47

TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) . . . . . . . . . . . . . . . . . . 48

24 WILLISTON ON CONTRACTS § 64:2 (4th ed.,
        updated May 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## The Case

*Nature of the case*    Aspect and Superior joined in a speculative venture for manufacturing precision small-arms ammunition. Both sides performed for about a year, but the effort—to build a competition-beating precision-ammunition operation from scratch—progressed slower than Aspect anticipated.

Just as the venture was on the cusp of commercial production, Aspect stopped work, demanded payment for invoices it was to have contribute as venture capital, and filed this suit. It said this was required because the parties hadn't signed a written venture contract. And it now says Superior repudiated the deal. But there was no deadline for a venture document. And Superior repeatedly reaffirmed the venture, which Aspect easily could have salvaged.

*Trial court*    Hon. Kerry Russell, 7th District Court of Smith County

*Course of proceedings*    Bench trial. Judge Russell found the parties had a contract (which was uncontested), but concluded the agreement did not create a partnership. He also concluded that Superior repudiated the venture. 4 CR 452-68 (**Appendix Tab A**).

Aspect alleged lost profits of $4.1 million—just in the venture's first year. Judge Russell properly denied this relief as speculative. But he granted Aspect—a previously inactive corporation with no expertise in commercial munitions manufacture—$175,000 as "restitution" for the alleged value of its input on the project. With attorney's fees exceeding $110,000, costs and interest, the judgment liability approaches $300,000. 5 CR 668-70 (**Appendix Tab B**).

## Issues Supporting Reversal

1. Does the evidence support the determination that Superior repudiated the parties' venture?

2. Does the evidence support a recovery of $175,000 as restitution?

3. Was Aspect's damage proof–principally James Sterling's conclusory opinion testimony and his litigation-driven, hearsay invoices—even admissible in evidence?

4. Was it actually Aspect that breached or repudiated the venture agreement?

5. Did Aspect fail to mitigate its damages?

6. Did the trial court err in not awarding Superior its attorney's fees incurred in successfully pursuing a contractual offset?

## Introduction

This case arises out of a joint-venture, for profit, between two corporations. Plaintiff Aspect had never before conducted business of any kind. 6 RR 21. Its protagonist, James Sterling, had been retired since 2000, living on his wife's earnings and his own disability-insurance benefits. 6 RR 22. The year was 2011 and the United States was in a panic-driven run on small-arms ammunition. Along with David Tubb and his company, Superior Shooting Systems, Aspect and Sterling set out on a venture to make the best quality precision small-arms ammunition, through Aspect, initially from Sterling's garage. The plan was to leverage Tubb's munitions expertise and celebrity in the firearms community.

The project proceeded for about a year, in which both parties devoted time to planning and implementation and Superior spent $240,000 on production equipment and supplies. Then, in January 2013, Aspect withdrew. It blamed Superior, claiming it had lost interest in the venture. Yet at every turn, Tubb affirmed Superior's intent to see the venture through, and Superior was continuing to perform, procuring supplies, even as Aspect withdrew and sued.

Aspect claims Mr. Sterling worked full time on the project, and that his work was worth a princely $140 per hour. But there is no admissible, probative evidence quantifying the level of Sterling's time commitment or setting any basis on which to determine the value of that time. Rather, Aspect relies on Sterling's inadmissible say so, "corroborated" by the cryptic, conclusory and hearsay invoices Sterling prepared after filing suit. These items should have been excluded pursuant to Superior's *Daubert/Robinson* challenge and its hearsay objection.

Sterling had utterly no expertise in the manufacture of munitions—or in manufacturing anything else. All Sterling could point to was that he had sometimes loaded his own ammunition, manually, as a hobbyist. Most evern manufacturing start up would present a substantial learning curve. This one certainly did.

Sterling seems not to have comprehended this: throughout trial, he expressed repeated exasperation over each modification, improvement, and refinement Tubb had made in the equipment or proposed manufacturing protocol. Sterling saw these as delaying production. Yet such tweaks are an unavoidable part of the process with any manufacturing start-up. Indeed, they are essential to ultimate success.

Aspect made much of the fact that Tubb at a dinner conversation said he thought the manufacturing operation should be moved to Superior's location in the Panhandle. But Sterling himself conceded that the suggestion was retracted almost immediately and, so, was not any proper basis for a claim of repudiation. Yet it is an express basis of the trial court's decision.

Superior failed to have all the raw materials to Tyler when Aspect finally was in position to go forward with commercial production. Aspect said this proved Superior wanted to repudiate the contract. 4 RR 37. But that is not possible. In fact, the case for repudiation is outlandish. Superior had invested $240,000 of hard cash and numerous man hours into the venture. And Tubb repeatedly confirmed Superior's commitment to the venture. When the trial court agreed with Aspect, its ruling was the first of several clear errors.

## Statement of Facts

**The Agreement.** In late 2011, James Sterling approached David Tubb, a renowned marksman, about entering a venture to produce high-quality small-arms ammunition at a high volume. 4RR109; 7RR17-18; 7RR44-45; 8RR41. The two men soon agreed to start such a business, through their respective companies---Aspect International (an inactive corporation owned

3

by Sterling's wife) and Superior Shooting Systems, through which Tubb produced and marketed rifle-related products. 7RR158.

Both companies would participate in control of the business and they would split the profits 50/50. 5RR11-12; 6RR6; 6RR167. Superior agreed to also (a) fund the purchase of production equipment and materials, 6RR169-70, 7RR18; (b) lend Tubb's name to the venture, 6RR169; and (c) provide access to Tubb's distributorship network. 4RR87-88. Aspect would (a) contribute the invoices from some IT work Sterling had performed for Superior; (b) refit Sterling's garage as an initial manufacturing facility; (c) obtain retail packaging for the ammunition products; and (d) run the venture's manufacturing operation. 7RR46-48; 4RR100.

**The Machine.** To facilitate the venture plan for mass-producing precision ammunition of unparalleled quality, the venture needed a loading machine capable of both high volume and extreme accuracy. To design and make such a machine, the venture hired FillPro, a company that had manufactured powder-filling machines for the Army, Navy, and Department of Defense. 4RR91, 4RR96; 4RR144-45; 6RR166-67.

Over the next eight to nine months, FillPro developed and built the machine, 4RR145; 4RR166-67, which Superior bought, 6RR50; 6RR177, and

4

Fill-Pro installed in Sterling's remodeled garage, in late October 2012.[1] The machine's digital infrastructure then remained incomplete and Sterling was still several months away from being capable of the machine's commercial operation. 4RR162, 168-69. Over the following months, Sterling worked at mastering the machine's commercial operation, understanding its Windows platform, and addressing IT issues. 4RR150-51. In the same period, various bugs and deficiencies with the machine and the surrounding manufacturing process had to be worked through with FillPro's designers. 4RR117. Sterling felt the machine was ready for production on January 1, 2013. 4RR236. But even he agreed that the necessary retail packaging was (which he was responsible for procuring) was not available until mid- to late January. 7RR34; 6RR12.

While Sterling was Fill-Pro's primary contact following the machine's installation, 4RR149, Tubb's involvement was strong on both the project's development side (where he initiated numerous improvements to the machine and the manufacturing process, *e.g.*, 4RR115; 7RR17-18) and its mechanical

---

[1]While the machine had some unique characteristics, 4RR148, FillPro had manufactured the same configuration before, 4RR148-49, and there were at least a few other machines like this one in operation. 4RR148-49.

aspect. 4RR152; 4RR115; 6RR13-15. Sterling disagreed, 4RR199-200, but Tubb felt he had as much time in the business as Sterling did. 7RR51.

**The Venture's End.** Sterling had been impatient with the venture's progress from virtually the start, complaining every time Tubb would make a process or machine improvement. Ultimately, Sterling pulled Aspect out of the deal---just before he would have had to bring the machine into commercial production. At this time, in January of 2013, Sterling (a) accused Tubb–the man who had invested $240,000 in the project–with trumped up charges of not intending to perform the venture, (b) demanded payment on the IT invoices Aspect was supposed to have contributed to the venture as capital, and (c) threatened to withhold the administrative credentials to Superior's customer website, which he alone controlled.

Tubb, who thought the business could be profitable and so wanted it to go forward, 7RR34, never once told Sterling he wanted out of the venture. He instead said he wanted to move forward. Superior even paid the IT invoices. But Sterling never returned to work on the project, and Aspect sued. In the suit, it demanded compensation of $300,000, DX58; 6RR129, and for a year refused to release Superior's equipment. 6RR51, 129. It turns out the suit was a designed exit strategy.

6

Sterling sent Tubb an email that was meant to go to his attorney. DX11; 7RR39-40. In it, Sterling revealed his own desire to leave the venture (consistent with his history as a workplace vagabond) and his plan for doing so, stating: "if I want out of it, my option is simply to send him a bill [for prior IT work] and then pursue it. . . . If he sues me and Aspect, then my only option, it appears, would be a countersuit out of Tyler. This further gives weight to the bill him and walk away option." 7RR39-40.

Today, after Superior has invested $240,000 in the machine and supplies, 6RR7-8, the machine gathers dust in Tubb's warehouse and is not expected to ever be put into production. 6RR223; 7RR26.

**The damage model.** Aspect's primary damage model, seeking lost profits, was rejected at trial and so is not relevant. Its alternative damage model sought compensation for Sterling's time on the ammunition project. Aspect claims Sterling---who had been retired and drawing insurance disability checks for over a decade, *e.g.*, 5RR22---somehow worked time worth over $300,000 on the project. 6RR95. But there was no evidence that Sterling's services had cost Aspect anything or ever would. 6RR95. Nor was there no probative evidence valuing the services that Sterling---a drop out

7

from 4 colleges, with no manufacturing or munitions-industry experience and a history as a serial job hopper[2]---claims to have performed.

To estimate the quantity of his services, Sterling relied on old calendars and a phone log. 4RR237-38; 6RR40-41; PX57. He and his wife never said what all he had done on the project, aside from talking on the phone and "research." They simply alleged he had worked at least 40 hours each week, for months. And Sterling assumed a value of $140 per hour for all of this time, 4RR238; PX57, even though he could recall only one instance of ever having been paid even $120 per hour (this was by Superior, on a prior IT project). 4RR238. In the end, Sterling valued his time at over $300,000, PX57; 6RR40-41, based on a series of litigation-motivated invoices lacking even a basic account of the underlying services or time increments. 6RR43, 48.

---

[2]Sterling, a workaday vagabond, had held about 12 jobs, each lasting a couple of years or much less. PX56; 4RR61-65. At trial, Sterling burnished his resume beyond recognition, painting a highly flattering but disingenuous picture of his responsibilities and accomplishments. Aspect's skilled trial counsel, in contrast, would say only that Sterling's resume was "interesting." 4 RR 31-32. That is more than charitable. Judge Russell, who saw Sterling's puffery for what it was, called it out in the court's findings. *See* 4 CR 163-64 (FOF 56).

## Summary of the Argument

The trial court determined that Superior repudiated the parties' venture by a combination of actions. This decision cannot be sustained. The alleged proof falls far short of the necessary showing of a fixed and definite, absolute renunciation of the contract. Rather, Superior consistently announced its intention to perform and it at all relevant times continued in its efforts to do so. If anyone repudiated the venture, it would be Aspect, which quit work and insisted that it would not resume the work unless Superior first paid invoices that the parties had agreed were a part of Aspect's contribution to the venture.

Because the determination of Superior's repudiation is insupportable, so also is the determination to award Aspect $175,000 in restitution for the alleged value of Sterling's time in the venture. By Aspect's reasoning, it was entitled to recover the value of Sterling's time, so as to be placed back "in the position it would have" occupied had Superior not breached. 4 RR 39-40. But that recovery was unsustainable even apart from the lack of a Superior repudiation, for many reasons. For instance: Aspect sustained no out-of-pocket loss and Superior reaped no quantifiable benefit from this time. Aspect didn't otherwise begin to prove a complete factual basis for restitutionary relief. And while according to Aspect's proof it had the clear opportunity to

9

mitigate any loss, it chose not to do so, thus forfeiting its right to recover.

Finally, the trial court erred in failing to award Superior a recovery of attorney's fees. Once that court determined that Superior was entitled to a $35,019 contractual offset refunding its payment on invoices, Superior was in its own right a prevailing party entitled to recovery its contract attorney's fees under Section 38.001 of the Texas Civil Practice and Remedies Code.

## Argument

1. **There is no evidence Superior repudiated the executory contract.**

The trial court found a repudiation. 4 CR 455, 458-59 (FOF 11, 33-35). But there is no evidence supporting that finding. And evidence of an ordinary, partial breach of the  ongoing contract would never allow Aspect to recover the value of what it had input into the venture. When the trial court rested its decision on such a determination, it abandoned over 100 years of settled law.

### A. In Texas, repudiation requires a contract's absolute renunciation.

The law does not generally allow one to claim repudiation of contract unless the circumstances indicate a clear and unmistakable intention to abandon it. Conduct that merely falls short of the agreed performance is an

10

ordinary breach—especially not when, as here, the defendant consistently states an intention to continue under the contract and the counter-party believes that intent is genuine.

The law of Texas respecting repudiation (also called anticipatory breach) is clear. At the turn of the *last* century, in *Kilgore v. Northwest Texas Baptist Educational Society*, the Texas Supreme Court already had held that to repudiate a contract, the intention to abandon the agreement must have been "declared in positive terms and unconditionally." *Kilgore v. Northwest Texas Baptist Educational Soc.*, 37 S.W. 598, 600 (Tex. 1896). Today, all Texas appellate courts agree that repudiation requires exacting circumstances—acts or words unconditionally declaring "a distinct and unequivocal absolute refusal to perform" the contract. *McKenzie v. Farr*, 541 S.W.2d 879, 882 (Tex. Civ. App.–Beaumont 1976, writ ref'd n.r.e.)(reversing because the record contained no evidence of any "distinct and unequivocal absolute refusal to perform the promise").[3] The defendant's words or conduct must

---

[3]*See also Preston v. Love*, 240 S.W.2d 486, 487 (Tex. Civ. App.–Austin 1951, no writ)(declaration of intent to abandon "must be in positive and unconditional terms"); *Ennis Business Forms, Inc. v. Gehrig*, 534 S.W.2d 183, 189 (Tex. Civ. App.–Waco 1976, writ ref'd n.r.e.) (Declaration must constitute an "unequivocal renunciation of the contract"); *accord Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1151-52 (5th Cir. 1981)(diversity; applying Texas law)("Typically, 'anticipatory repudiation' arises when a party unequivocally renounces his duties under a contract prior to the time fixed for his performance.").

clearly announce "a distinct, positive, unequivocal, and absolute refusal" projecting "a fixed intention to abandon, renounce, and refuse to perform the contract." *Davis v. Canyon Creek Estates HOA*, 350 S.W.3d 301, 313 (Tex. App.–San Antonio 2011, pet. denied).

Understandably, the cases in which trial-court findings of repudiation are reversed on appeal are legion. *E.g., Davis*, 350 S.W.3d at 313 (finding no evidence of the necessary "distinct, positive, unequivocal, and absolute refusal' to perform). When the claim is that repudiation should be inferred from conduct, the burden to show an absolute repudiation is an especially difficult hurdle. And rightfully so. Otherwise, there would simply be too much confusion as to what constituted repudiation and when it had occurred.

**B. Superior didn't make any fixed and unequivocal renunciation of the venture.**

Superior is alleged to have worked a repudiation by (1) not acting aggressively enough to negotiate a written venture agreement, (2) not having sufficient raw materials on site when Aspect was finally ready for commercial production, and (3) suggesting that the manufacturing operation might someday need to move from Tyler (where James Sterling, Aspect's principal, lives) to Superior's Panhandle headquarters. The case holds no water.

12

This venture was a manufacturing start up. They don't occur without hiccups—delays, setbacks, and revisions to even the most carefully hatched plan. Matters in this case played out mostly according to this norm. They didn't establish the necessary absolute, fixed intent to renounce the venture.

### 1. Aspect relied on speculative conclusions.

At trial Sterling opined that "Tubb was done, 6 RR 21, and claimed that in the venture's last days he hadn't been "getting an indication that [Tubb] wanted to continue." 6 RR 29. But Sterling's subjective impression and self-serving opinions aren't a sufficient basis for a repudiation finding. Instead, a viable repudiation finding must be built on evidence of Superior's actual words and conduct. This doesn't exist here.

The agreement, reached late in 2011, 4 RR 93, was quite general. The venture would make and sell small-arms ammunition. Superior would provide the materials, fund the purchase of production equipment, and allow the venture to use Tubb's celebrity and Superior's distributor network. 4 RR 215; 6 RR 50, 169-70; 7 RR 18. Aspect would provide the initial manufacturing facility and supervise the manufacturing process—"load the ammunition, package it, and distribute it to the distributor or directly to the end user. 4 RR 89-90; 6 RR 172-73. It would contribute as capital about $35,000 in past

invoices, from a website project undertaken for Superior. 7 RR 47-48. And just as Superior contributed capital, equipment and materials, Aspect was to contribute what Tubb understood to be Sterling's knowledge of running multi-level companies, securing military contracts, and IT experience. 7 RR 24-25. Any profits would be divided equally. 4 RR 87-88.

There were no further specifics: No time periods or deadlines, 6 RR 152, no specific schedule as to which calibers to produce at what times, and nothing in particular about the timing of the materials purchases, or quantities, or exactly what would be furnished.

The goal was to produce a product that was higher quality than the competition but at an equivalent price. 4 RR 109. Sterling expected that Tubb's reputation and a "really accurate" product would bring success. 4 RR 221-22. This of course required an ammunition loading machine that could make precision ammunition of no equal, in several calibers. 7 RR 17-18, 43-44.

As it turned out, Sterling had never run any multi-level company, or secured any military contract, or sold ammunition before. 7 RR 61.

## 2. Superior's actions were the opposite of repudiation.

### a. Tubb's comments about moving the manufacturing location were no repudiation.

Sterling has said Superior repudiated the agreement on November 14, when Tubb proposed to move the equipment to Canadian, Texas, where Superior is located. 6 RR 17. But this was no evidence of a repudiation.

- That manufacturing operations might move in the future is not inconsistent with the parties' agreement, which was that the manufacturing operations *initially* would be in Tyler.

- There is no reason why an eventual move of operations from Tyler would oust Aspect from control of or supervision over the manufacturing operation.

- A statement that an action *may* be considered in the future ordinarily is not a present breach, let alone a repudiation of the entire contract.

- Tubb never attempted to move the equipment while the agreement remained in force. 6 RR 141-42.

#### i. *Tubb's comments were not inconsistent with the agreement.*

There was no agreement to remain in Tyler forever. The *initial* manufacturing location was to be Tyler. 6 RR 172-73. Sterling's own draft of the proposed joint-venture agreement stated "Venture parties agree that Aspect International will 'initially provide facilities for the operation.'" 6 RR

142; PX1. Mrs. Sterling, Aspect's sole shareholder, agreed that the deal was for manufacturing to be in Tyler "to start." 8 RR 52. Thus, even Sterling conceded that the agreement contemplated that the facility might move at some point. 6 RR 142.

Nor did the thought of an eventual move threaten Aspect's role as manufacturing supervisor. Sterling claimed a move of the equipment would take the manufacturing out of Aspect's control. 4 RR 194. But how is that? The where of the manufacturing and the who (as in who supervises or controls the manufacturing process) are different matters. Businesses move manufacturing operations all the time, with key supervisory personnel moving along with them. Aspect, which had no other operations holding it back, could relocate with the operations.

And, in any event, Tubb's statement clearly implied Superior's intention that the parties would in the future still be in their venture. There was no intention to void the contract.

> ii. *The comments were excused by Sterling's prior misrepresentation.*

The context of Tubb's statements is critical. The machine had been located in Tyler and not in Canadian largely because Tubb's location was

16

close to railroad tracks. The thought was that vibration from passing trains could impair the equipment's accurate performance. 7 RR 25. Tubb had made a big deal of this. Yet Sterling had for months avoided telling Tubb that his own Tyler location also was close to a railroad—closer than Tubb's. 7 RR 25-27. Tubb learned this *after* the $200,000 machine was installed, upon his visit to Sterling's home. When Tubb saw the abutting train tracks, he felt wronged and hurt. 7 RR 60.

According to Tubb, he commented about a potential move while the men were trying to work out the fact that Sterling's garage was located close to train tracks. 7 RR 25-27. But after a thorough discussion about the garage's proximity to train tracks, Tubb relented and allowed the equipment to sta in Tyler, for Sterling's convenience. 6 RR 195. Ultimately, Tubb got over the train issue. 6 RR 196.

### iii. Any statement about initially moving operations was retracted.

An otherwise repudiating statement will not count as a breach if it is retracted before the repudiation is accepted. As the Restatement (Second) of Contracts states: an anticipatory breach "is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured

party before he materially changes his position in reliance on the repudiation or indicates to the other that he considers the repudiation final." RESTATEMENT (SECOND) OF CONTRACTS § 278(1); *see Glass v. Anderson*, 596 S.W.2d 507, 512-13 (Tex. 1980) ("Anderson could ahve retracted his repudiation under the circumstances described in section 278(1) . . .")(citing Section 278(1) with approval). That is what happened here.

As Sterling conceded, before the Tubbs' Tyler visit was over, Tubb agreed that the equipment could remain in Tyler initially, where Sterling would try to "work the bugs out." 6 RR 192-93; *see also* 4 RR 201. Sterling even memorialized this in an email. DX 3 (Sterling's email states "on November 14, 2012, you stated your intention to break your agreement. *Within 24 hours you reversed your decision.*")(emphasis added); *accord* 6 RR 139. Sterling then confirmed that the venture was ongoing, stating that "[a]ny materials you can send me I will load and ship out for sale." PX99, p. 2. Thus, as of December 24, Sterling did not take anything arising from Tubb's Tyler visit as a repudiation. PX99.

### iv. *Superior continued to perform.*

Even when one breaches a contract, if he later resumes performance, there is no anticipatory or total breach, but only a partial one. *E.g., Ravkind v. Ravkind*, 1995 WL 458856, *1 (Tex.App.–Houston [14th Dist.] Aug. 3, 1995, writ denied). Well after the Tubbs' November visit to Tyler, as Sterling conceded, Tubb's position was to move the deal forward. 4 RR 203. As is undisputed, Tubb then continued investing time and money towards the machine's ultimate commercial operation. 4 RR 116. And when Sterling complained about the lack of .223 bullets, Tubb pledged to check into it and step up the process of getting materials. 4 RR 206. As Sterling conceded Tubb had ordered bullets for subsonic ammunition. In fact, he had bought all the supplier had. 4 RR 209. And Tubb had obtained quite a lot of "brass." 4 RR 210-12.

Tubb was committed to the project, otherwise he wouldn't have pumped $240,000 into it. 6RR7-9. Superior bought the equipment, paying a quarter million dollars for it. There is no dispute about that. There is no allegation that Superior ever denied the venture the use of his name. The venture didn't make it that far–but only because *Aspect* chose to end it

19

prematurely, consistent with Sterling's unbroken string of fleeting jobs and business opportunities.

> ### v. The alleged "repudiation" was never accepted.

Even an absolute renunciation "merely gives the innocent party . . . the option to also consider the agreement to be at an end." *Townewest HOA v. Warner Communication, Inc.*, 826 S.W.2d 638, 640 (Tex. App.–Houston [14th Dist.] 1992, no pet.). If the claimant instead treats the contract as continuing, the sole remedy is for any partial breach. RESTATEMENT OF CONTRACTS § 317(2); *Kaiser v. Northwest Shopping Center, Inc.*, 587 S.W.2d 454, 457 (Tex. Civ. App.–Dallas 1979, writ ref'd n.r.e.). The intention to repudiate, if it is to have effect, "must be accepted by the other party as a complete and binding repudiation and termination of the contract. . . . [D]eclarations concerning future matters must be unconditional and *must be promptly acted upon by the other party.*" *Dudley v. Born*, 710 S.W.2d 638, 644 (Tex. App.–Beaumont, 1986, writ ref'd n.r.e.) (emphasis ours).[4] Moreover, if, as

---

[4]In *Dudley*, the defendant had come to the plaintiff in August or September, while their construction project was ongoing, and suggested that Born start looking somewhere else to finance the project. This was no evidence of repudiation, both because it didn't meet the exacting requirements for a declaration of repudiation, *id*. at 643 ("Even under Born's version of the conversation, Dudley's statements were not of a nature so as to constitute an anticipatory repudiation"), and also because Born "did not act upon" the statement but made subsequent requests for advances of funds. *Id.* at 643-44. This case is no different.

Aspect did, a party elects to treat a contract as continuing even after learning the facts allegedly constituting the other party's breach, the plaintiff loses any excuse for its own subsequent non-performance. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). Performance constituting an election to treat the contract as ongoing need not be long, but may be brief. *See Dora v. Mullick*, 2000 WL 33322942, *6 (Tex. App.–Texarkana 2001, no pet.)(where plaintiff learned of defendant's breach in January 1993 but continued performance of the contract for another month afterwards, the subsequent performance conclusively waived any right to use the opponent's breach as an excuse not to perform his own further contractual obligations).

Sterling has admitted facts constituting continued performance: As Sterling admitted, after Tubb's comment he and Tubb worked the remainder of the day on the equipment and the Tubbs stayed over at the Sterling home. 4 RR 193-94. Sterling and his wife also agreed that they continued to perform, working on both the equipment and the packaging afterwards. 8 RR 74-75. And in this suit, Aspect has invoiced Superior $22,400 for Sterling's further work for the entire month of December 2012. PX 57.

---

Tubb's statements were not repudiations. And Aspect in any event treated the contract as continuing.

What is more, on January 7, 2013, Sterling confirmed that the parties had reaffirmed their agreement to manufacture ammunition and split the profits 50/50 "of the net profits coming from our manufacture of an ammunition product line for your company." PX 106. This means, of course, that nothing occurring beforehand could be taken by Aspect as a Superior repudiation because there was never any acceptance of it.

### b. Superior never intentionally withheld supplies.

Aspect argues that Superior didn't get the necessary component materials to Tyler when, finally, Aspect was in a position to begin commercial operations. There are several problems with that allegation.

#### i. *The materials that weren't present were on order.*

Sterling's contention that Superior withheld supplies was a ruse, and certainly was not supported by legally or factually sufficient evidence. Tubb had bullets on order. He kept Sterling informed about their status. 7 RR 34. And while all the bullets Tubb sought weren't in Tyler when Aspect quit the contract, the bullets, which were being shipped, in fact could have been there if Aspect would have waited just a couple weeks more, until a week beyond when it filed suit. 7 RR 34, 58. Tubb was having difficulty getting bullets. But

he was working on the problem. On December 14, 2013, Sterling and Tubb were exchanging emails about a "lot" of subsonic bullets Tubb had located. PX95. On January 29, 2013, just days before Aspect sued, Tubb emailed Sterling to confirm that a full pallet of "223 brass" had arrived while Tubb was at a firearms show, including brass for the venture's "absolute" brand ammunition. PX101.

At trial, Aspect held up Sterling's assertion that he had located a distributor with access to the same caliber bullets Tubb was waiting on. Based on this, Sterling speculated that "the materials were never ordered." 4 RR 205. The premise—Sterling's claim that he was able to locate bullets—does not compel the Sterling's conclusion.

Even if Sterling were able to order the materials from a distributor, Tubb's contact was with the president of the manufacturer. 4 RR 204-05. That a distributor has bullets is not evidence that Tubb's direct order with the manufacturer wasn't genuine. When demand exceeds supply, there is nothing unusual about a manufacturer giving priority to its distributors over direct customers like Tubb. Sterling's contrary speculative conclusion is no evidence. *See, e.g.*, *Litton Indus. Prods. v. Gammage*, 668 S.W.2d 319, 324 (Tex. 1984) (proof that is subject to equally plausible and opposing inferences

23

is no evidence of either one); Calvert, "*No Evidence and Insufficient Evidence Points of Error*," 38 TEX. L. REV. 359 (1963). The proof is simply too weak to support any probative inference that bullets had not been ordered, let alone that Superior had formed a fixed and absolute intention to repudiate the deal.

### ii.    *Any material shortage was easily cured.*

There is no allegation that Superior *refused* to order or pay for the requested materials. This is critical, because Aspect claims that it was able to source the materials. If that is so, where is any repudiation? If Aspect had located the materials, it could have sourced them and had Superior pay the bill. This is what anyone committed to the venture would have done. A matter so easily mitigated, at no cost to the claimant, is no basis for a repudiation finding—especially not where, as here, Aspect conceded knowing that Superior wanted to continue on in the venture.

### iii.    *Any minimal delay in getting materials reflects the venture's start-up nature and external constraints.*

No delay in getting some supplies could reasonably be taken as a repudiation by Superior. Indeed, until mid-January of 2013, right before Aspect sued, there would have been no need to have the component materials

on site because the venture wasn't otherwise ready to launch into commercial production.

As even Sterling agreed, the steps predicating the actual commercial production of ammunition were formidable. 4 RR 89-90 ("a myriad" of things had to be done). Many of them still required modifications throughout November and December of 2012 and into January: The loading machine required adjustments, Sterling still needed to work on the proficiency for commercially operating the machine, and Aspect needed to follow through on its own commitment to get the necessary packaging.

To be sure, Sterling at trial opined that the machine, delivered in late October, 2012, 6 RR 9, could have been used to manufacture ammunition right away. 6 RR 12. But that wouldn't have been apparent to one in Tubb's position. In fact, it wasn't a possibility but was negated, by undisputed proof that:

- The expertise necessary to successfully operate the machine on a commercial scale would have taken a considerable period of time to develop. 4 RR 151. As Tubb understood and Rue Marshall testified without contradiction, when the machine was set up, Sterling, who had no experience making commercial ammunition, 4 RR 172, was two or three months away from the necessary proficiency for commercial production. 4 RR 90-91, 168-69.

25

- It also was impossible to commercially produce any product because there wasn't any packaging, which didn't show up until mid- to late January. 7 RR 34; 8 RR 81-83. Sterling had been in charge of ordering the boxes. 6 RR 12-13.

- The venture was launched at the height of a frenzy in the demand for ammunition that invariably squeezed the supply of component materials such as bullets.

- Well after the machine was installed, the parties and Rue Marshall were finding "quite a few" issues with the equipment's operation, including software deficiencies and "digital infrastructure issues" that FillPro's software designer had to work through. 4 RR 117, 151, 162.

There was a cornucopia of changes still to be made to toolheads, sorting routines, pressure adjustments, and innumerable other critical items. 6 RR 14-15. As of November 21, for example, Aspect was addressing outside consultants about ongoing software issues, and issues regarding "sensor adjustment/design." PX112. Sterling's email of that date notes the need of a "setup procedure" respecting "set up fills, press forces and inseriton depth/part height.," and notes a serious "shortfall" and "impractical[ity]" preventing "long runs" and limiting any production to short, "lot runs," after which "a lot must be started, examined and tested," and rounds not within specifications must be manually identified and discarded. PX112. In response, the consultant had proposed "an add on to the system," to be preceded by "discuss[ion]" as to "how you want this to work exactly." PX112. But Sterling disagreed,

26

arguing that the problem was instead "software related," and confessing that "[i]n retrospect I should have made sure that this capability was put in from the beginning." PX112.

Yet another issue discussed in the November 21 email concerned the "primer tube blast shields," which had to be "taken back to [Tubb's] shop for design modification." PX112. The same email states that Tubb and Sterling would "decide on a sorting algorithm" that will in turn "require software changes and testing time." PX112. But this algorithm could not even "be truly considered until we see substantial production to determine primarily where rounds are consistently dropped by pressure settings." PX112. The issues continued. PX 112. And this is just from one of *Aspect's* trial exhibits.

Even in December, Rue Marshall was quoting costs for yet-to-be-made "software modification[s]" and Sterling was exploring "anything that improves the production output." PX92.

Just as Sterling was inquiring about inputs like bullets and brass, Tubb was monitoring Sterling's progress towards getting production boxes. 7 RR 55. So, the delays precluding commercial operations were *mutual*. Aspect wasn't ready to distribute any product commercially before, at the earliest, mid-January, 2013—just a few weeks before it sued. Tight up until Aspect

sued, there was simply no need, acute or otherwise, for commercial quantities of raw materials. The fact of a delay in obtaining bullets or brass is, in these circumstances, not evidence of the necessary absolute renunciation of the venture. *See Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1150 (5th Cir. 1981)(applying Texas law).[5]

> ### iv. *The agreement had not imposed any particular deadline for provisioning materials.*

Sterling was impatient. But his impatience needs to be distinguished from the contractual promises. This was a start-up manufacturing operation, seeking to best the competition for quality. The parties were learning as they went. The agreement didn't provide any template: it stated no internal milestones or deadlines for completing them. These were instead matters for good-faith efforts, and basic trial and error.

---

[5]In *Rhodes*, the defendant's failure to have promptly obtained the necessary Texas medical licensure was not a basis for finding repudiation when at the time several weeks of "formal orientation" were still ahead before the defendant doctor would have been in a position to treat patients even if he had promptly secured a Texas license; thus, the delay in licensure "was not then acute." 654 F.2d at 1150. Here, the lack of commercial quantities of materials would not have delayed production at all in 2012, because Aspect for its own reasons then was in no position to attempt commercial production.

*v.   Aspect knew Superior intended to proceed.*

As Sterling conceded and Tubb testified, Tubb never once said he was ending the partnership. 6 RR 21. In an email intended for his counsel, Sterling confessed to believing that Tubb "wants to continue," and "wants a contract." DX 11; 6 RR 25-26. In a later, December 29, email to Tubb, Sterling likewise admitted he believed Tubb still "would like to continue to do business." PX109. This was with full knowledge of Tubb's acts and statements (and without the distorting effects of litigation influences). And Tubb did want the business to go forward, with *Aspect* managing the operation, because he believed it would be profitable. And he had no intention of loading ammunition. 7 RR 34, 45-46. Tubb told Sterling as much several times, including on January 7, 2013, as reflected in a recorded phone transcript. 7 RR 39.

**3.   Both parties were negotiating towards a written contract.**

The district court's third and final basis for finding repudiation was Superior's alleged failure to commit to a written contract. Yet, as with other aspects of the deal, there had never been a timetable specified for such a

document. In fact, the parties' agreement had not specified any requirement that there even be a written contract document.

The fact is that *both* parties were moving steadily, if deliberately, toward a written document.

The first evidence of any proposed written agreement from Aspect–a mere "sample" fill-the-blanks form of a Joint Venture Agreement, PX 1—was not passed to Superior until mid-September 2014. 4 RR 120. Tubb's counsel initially had recommended an equipment lease arrangement, 4 RR 217, then recognized that a lease was inappropriate for the situation, causing some confusion. 4 RR 217. But it is clear he was actively working on the matter, at Tubb's direction.

On November 15, for instance, counsel was advising Tubb as to several concerns he had respecting Aspect's proposed form document including "especially . . . the termination provisions . . . ." PX 110. He recommended that a "business counsel" "oversee" the drafting of a new, clean document because in his view the existing draft's problems could not "be fixed by simply removing the objectionable termination provisions." PX110. Two weeks later, on November 30, Superior's attorney was actively working on a "Joint Venture Agreement," but had gotten "stuck on a couple things" and was

thus recommending the involvement of an additional "Texas business attorney" to help get the contract drafted "in a manner which is right for Texas." PX108. Moreover, Tubb and Sterling were having "numerous" phone discussions and email exchanges. In that time, not once did Tubb say he would not sign a written document. Meanwhile, the parties had been performing within the venture for about a year without a written contract to absolutely no adverse effect. None of this sounds like a repudiation was in the works.

At trial, Sterling contended he had "observed" Tubb's reluctance to entering a written agreement and claimed Tubb appeared to have his mind made up to end the deal. 4 RR 121. But Sterling's own contemporaneous communications, in December 2012 and January 2013, show otherwise. Then, even Sterling took Tubb to indicate that he, too, was trying to salvage the deal. 6 RR 15-16. Then—before his perspective was colored by the litigation—Sterling conceded the relationship required "some back and forth" and time for exploring "other ideas," PX82, and he confessed to believing that Tubb also truly wanted a contract. DX11; 6RR25-26. How could he honestly think anything else? Sterling certainly had no alternate explanation for the concrete proof of Superior's efforts toward a written document.

31

The progress towards a written document may have come more slowly than Sterling would have wished. But that reflects nothing more than the simple fact the parties had not settled on the venture's precise legal structure.

The district court took an ordinary negotiation over a venture's legal form as proof of repudiation. This was error.

## C. It was Aspect that chose to get out of the contract.

Having never persevered in any job of business beyond a couple yers, 8RR83-85, Sterling just didn't appear to understand that manufacturing start ups don't always work like you want them to, 7 RR 41, regardless of the parties' best intentions. Instead, by December 14, 2012, DX11, Sterling had formulated an exit strategy and was seeking counsel's blessing for it, saying "if I want out of it, my option is simply to send him a bill and then pursue it." DX11; 7 RR 39-40. This email concluded that other factors gave "further weight to the bill him and walk away option." 7 RR 40. (Incidentally, in this same email Sterling admitted to knowing Tubb wanted to go forward on the deal.)

So what did Sterling do? He promptly dunned Tubb for the IT invoices that Aspect was supposed to have contributed as capital for the venture. And

he announced he was stopping work—that he "will not spend any further time on this matter other than the time required to accept delivery of the packaging already in process" until a signed contract was created. PX106, p. 2. Sterling followed this with a lawsuit then more invoices, allegedly accounting for his time spent on the partnership. 6 RR 38. In the process, Sterling announced Aspect's intent to leave the venture loud and clear. 7 RR 39-40. And he did so upon an ostensible basis (the absence of a signed venture agreement) that is as a matter of law not a Superior repudiation. PX106 ("Since we don't have a signed contract on the ammunition project, you need to pay me for my time on the SMD project."). There was nothing about the venture that would have made forgiveness of these invoices depend on when or even whether the parties signed a written document.

If anything in the case were a repudiation, this would be it. It was not excused. It explicitly renounced an express contract term, and it did so unequivocally. It was not retracted, but was implicitly accepted when Superior paid the $35,019 billed, albeit under duress to reclaim the administrative rights to its retail website. DX27. Aspect never resumed work.[6] Its decision to quit the venture, made *before* Aspect was capable of performing its duty to

---

[6]Sterling's total work for January 2013 was for 1.5 hours, or $210. 6 RR 48.

33

produce commercial quantities of ammunition, thus relieved Superior of any subsequent duty to perform and certainly thwarted Aspect's recovery of substantial restitution damages.

When the trial court denied that Aspect's act of commercial ransom was a breach of contract, that was clear and reversible error.

*In summary*, Just because Sterling, not being otherwise employed and being innately restless, chose to complain of Tubb's tweaks and refinements, that doesn't mean Superior worked any repudiation. Rather, Superior committed to the deal in both word and act. It plowed nearly a quarter million dollars into specialized equipment and materials. It had arrangements pending for shipping additional materials. It never refused to provide materials. Through Tubb, it reassured Aspect of its commitment. And any delay in procuring bullets was only slightly longer than Aspect's own delay in getting packaging. There was never any reasonable case for saying that Superior expressed any fixed and absolute intention to avoid the contract.

If anyone repudiated the venture, it was Aspect.

**II. There is no evidence supporting Aspect's damage recovery.**

The district court rejected a lost-profit recovery, as it was entitled to do. But it awarded an indefensible recovery allegedly compensating Sterling's input of time into the venture. The record does not sustain any such recovery. Other than its request for the rejected lost profit, Aspect's only alternative claim at trial was to "be placed back in the position it occupied before contracting." But Aspect never proved it is any worse off than before the parties contracted. Rather, it entered the agreement as an inactive company, with no assets and no other prospective business dealings, and is none the worse off today.

**A. Aspect has no basis to recovery for Sterling's time.**

**1. Because the venture was a partnership, Sterling's time is not compensable.**

In this case, the Texas Business Organizations Code provides both the framework for determining whether a partnership exists and the rules governing the consequence of the venture's legal form. Under this Code–specifically, its section 152.203(c), a partner is not entitled to receive compensation from the other partners for services rendered to the partnership. Upon a partnership's dissolution, the parties are entitled to return of their hard

capital. But, recognizing that all partners contribute time, no partner is entitled to compensation for services rendered to the partnership. TEX. BUS. ORG. CODE ANN. § 152.202. Such investments of time do not add to the partner's capital account.

When it comes to identifying a venture's form, the Business Organizations Code displaces the old rigid rules of the common law, under which a failure to meet all the partnership factors required the courts to reject a partnership. Now, the approach is less formalistic and more practical. Now, under the Code, any "association of . . . persons to carry on a business for profit as owners creates a partnership" unless an association or organization actually has been created under a different statute providing for a different business form. TEX. BUS. ORG. CODE ANN. § 152.051(b).[7] In other words, unless the parties clearly have opted to create a business under another recognized business form, the default position is a partnership. In determining this, the Courts must consider the totality of circumstances. As *Ingram v. Deere* makes clear, existence of a partnership is determined from the totality

---

[7]"(b) Except as provided by Subsection (c) and Section 152.053(a), an association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a "partnership," "joint venture," or other name." TEX. BUS. ORG. CODE ANN. §152.051(b).

of circumstances considering the statutory factors. Unlike the common law, proof of every relevant factor is not required. *Ingram*, 288 S.W.3d 886, 898 (Tex. 2009). And yet there is such proof in this case.

Here, the proof establishes each partnership factor:

- ***Receipt or right to receive a share of profits.*** Aspect has admitted an agreement to split profits equally.

- ***Expression of an intent to be partners.*** Sterling admitted multiple times that he intended to create a partnership, and was impeached at trial by his deposition testimony to this effect. *See* Ex. DX7, DX18a, DX24.

- ***Participation in control of the business or the right to do so.*** Aspect had the right to set up the manufacturing facility and it did so. Aspect likely had the right to run the manufacturing facility, to handle packaging issues, and otherwise to participate in the venture's control.

- ***Agreement to share losses.*** Implicit in the splitting of *net* profits is an accounting of expenses and losses. As in any partnership, Aspect and Superior as well stood to lose their investments –there was no provision for Superior to reimburse Aspect for its labor–if the venture proved unsuccessful.

- ***Agreement to contribute money or property to the business.*** Both parties agreed to and did contribute money and property. Superior contributed a quarter million dollars in specially procured equipment and supplies, while Aspect contributed expenses to set up an initial manufacturing location, and it agreed to contribute an accounts-receivable balance exceeding $35,000. DX24.

So as a matter of law and despite the district court's contrary determinations, 4 CR 455 (FOF 12 - 18),467 (COL 2), the parties in this case

37

created a joint-venture partnership. Consequently, Aspect is not entitled to compensation for its time. TEX. BUS. ORG. CODE 152.203(c). This is only fair, as *both* sides have invested considerable time into the deal. Superior in addition happens to have invested about a quarter million dollars, most of it in a machine that today sits, gathering dust, representing an additional, huge hard-dollar loss. And Aspect—which repeatedly told the trial court it just wanted to be put back where it was before the agreement—is no worse off today than when entering the deal.

### 2. There was no probative evidence quantifying any benefit to be restored.

There is nothing to be restored. The restitution interest is the interest in having restored the "benefit conferred on the other party." RESTATEMENT (SECOND) OF CONTRACTS § 344; quoted in 24 WILLISTON ON CONTRACTS §64:2 (4th ed., updated May 2014). Sterling's time was contributed to the venture. But this does not mean Superior received any benefit to be disgorged. The benefit, if any, conferred on Superior was embodied in the equipment–the only thing Superior got out of the deal. Stering's time thus would not have provided Superior a disgorgeable benefit except if it enhanced the equipment's value beyond what FillPro provided. There is no evidence of any

such enhancement and certainly no attempt to value it. Consequently, there is no legally (or factually) sufficient basis for the lower court's damage award. *Cf.* 4 CR 461 (FOF 40).

**B.    Sterling's damage proof was inadmissible, no evidence, and did not show a complete damage calculation.**

The district court erred in overruling Superior's motion to exclude Sterling's opinion testimony on Aspect's damages, as unreliable per *Robinson*. See 1 CR 38.

Sterling offered his bald conclusion that the charges for his time were the reasonable and customary hourly compensation for a project manager. 6 RR 136. But there was no evidence Sterling was qualified as an expert to testify to the value of time spent in making preparation for the venture. As the district court noted, Sterling was not qualified as an expert on such matters as marketing, economics, accounting, lost-profits calculations, business, or any "other relevant commercial endeavors." 4 CR 466 (FOF 56(g)). There is no reason to think he was any better qualified to value the time he spent attempting to set up a scratch manufacturing operation in the munitions industry. Rather, the evidence, fairly characterized, is merely that Sterling once might have been paid $120/hour by Superior in connection with setting

up an internet website. 4RR238.[8] This does not make Sterling an expert on damages in this case, which does not concern any website.

Superior bought production equipment from FillPro, a commercial vendor of such equipment. Superior rightly owns the equipment, having paid for it and taken title in its name. There is no probative evidence that Sterling's time, as opposed to Tubb's substantive inputs, enhanced the equipment's value and no evidence quantifying any such alleged enhancement. Indeed, there is no evidence of what exactly Sterling actually did respecting the machine. He did not design it, or manufacture it, or install it.

The attempted valuation proof—Sterling's speculative say so and a set of cryptic and litigation-driven hearsay "invoices" that merely memorialize Sterling's *ipse dixit*—was clearly inadmissible over Superior's objection (and would in law be no evidence in any event). Indeed, Sterling, with his self-serving and speculative valuation opinions, is a poster child for why the courts are to act as gatekeepers against such testimony. As the Texas Supreme Court holds:

- "[T]he evidentiary value of expert testimony is derived from its basis, not from the mere fact that the expert has said it." *Houston Unlimited,*

---

[8]Sterling also purported to know that the project manager for San Diego Media, on its web site build, was paid $140 per hour. 4 RR 238-29. But what a website build might have to do with this case (nothing) was never addressed.

*Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014).

- Regarding that basis, "[i]t is incumbent on an expert to connect the data relied on and his or her opinion and to show how that data is valid support for the opinion reached." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex. 2009).

- "Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004).

- Conclusory, naked and unsupported opinion testimony "cannot support a judgment even when no objection" to it is lodged at trial. *Id.*

Sterling's bald, unexplained and speculative opinions are not exempt from these rules, even if he is a party. They are unreliable and inadmissible, and would lack any probative value even if they would never have been attacked in a *Daubert/Robinson* motion. *Id.*[9]

---

[9]Aspect's remaining proof–mostly vague assertions that Sterling was always "busy" "making phone calls" and "researching" for the venture, *e.g.*, 8RR52-53–is insufficient, both legally and factually, to prove $175,000 in compensable services. The evidence is that the venturers' tweaks to FillPro's design and to the manufacturing process were primarily driven by Tubb's detailed knowledge and his substantive inputs. *E.g.*, 4RR152-53. Indeed, Sterling, who lacked the perspective of prior expertise in the commercial munitions industry and apparently sought mostly to pocket a quick buck during a temporary supply shortage, *complained* throughout trial of seemingly every such tweak, viewing these necessary inputs as mere delays, never mind that the goal was to produce a superior product.

At bottom, if any tangible benefit from Sterling's inputs survived his decision to pull the plug on the parties' venture, there is no evidence identifying it or attempting to quantify its value, let alone any non-speculative proof that this would have cost $175,000 on the open market. This is fatal to Aspect's recovery.

Because Aspect presented no other expert testimony capable of establishing the existence or amount of recoverable damages, the proper remedy is a take-nothing judgment.

## C.   Aspect could have mitigated any damage.

It is a contract claimant's duty to undertake reasonable steps to mitigate damages or act at its peril. *Stanley Manly Boys' Clothes, Inc. v. Hickey*, 259 S.W. 160 (Tex. 1924). This logically includes ordering available supplies when that will avert a larger loss. Here, Aspect says Tubb's inability to promptly secure bullets was a sham because Sterling claimed to have located similar materials, at a distributor. Yet Aspect produced no evidence of any attempt to mitigate its damages by actually ordering the bullets. There is no evidence Aspect was not capable of such action, or that it could not have accomplished the equivalent merely by ordering the materials, with the bill

forwarded to Superior for payment. There is no evidence Superior would not have paid any such effort.

In any event, the failure to have provided raw materials would at most have sustained a recovery for the profit lost owing to the temporary inability to produce. For example, if while the venture was up, running, and operating at a profit, production would have halted for 3 weeks because Superior didn't pay for raw materials, Superior might then have been liable to pay Aspect damages measured as 50% of 3 weeks' proven lost profits. But the record doesn't sustain even this recovery because the evidence was that Aspect located the necessary materials and presumably it could have obtained them before it was otherwise ready to proceed with commercial production.

## D. When Aspect left the venture, it was no worse off than when it began.

Aside from the failed request for speculative lost profits, Aspect asked to be put in its pre-contracting position. Yet there is no evidence Aspect was any worse off when it exited the venture than when it entered it as an inactive, penniless company that had never before done any business. 5 RR 21.[10]

---

[10]According to Sterling, he formed Aspect in 1997 just in case he might ever want to do something in the firearms industry. 5 RR 21.

43

Nor is there any finding that Aspect was any worse off because of the deal. Rather, without considering Aspect's lack of any changed condition and without evidence quantifying any benefit to Superior, the district court simply found that "AII sustained restitution damages in the amount of $175,000.00." (FOF 40.) Aspect's proof was clearly not probative of this.

Aspect, solely owned by Sterling's wife, never was out of pocket anything for Sterling's time.

## E. The recovery is excessive.

$175,000 just isn't a reasonable recovery in this case, given that:

- Aspect was an inactive company that had never conducted business.

- Sterling, a former workplace vagabond with an implausible account of his workplace exploits, was 13-years retired, with no experience commercially producing ammunition.

- The amount awarded rivals the entire amount spent on production equipment and manufacturing materials.

- FillPro, which had made essentially the same machine before, did the design, manufacture, and install.

- Just because Sterling called FillPro frequently doesn't mean so many calls were necessary or always helpful. Even FillPro's Rue Marshall–whose favor Sterling had curried–called Sterling's involvement "excessive" and implied it had gummed up the manufacturing process.

44

- The machine —which Superior bought—is mothballed, with issues, and may never be brought into production.

Sterling never documented any truly relevant prior expertise, certainly not as a project manager on the start-up of a manufacturing business. Rue Marshall, Sterling's contribution to the project was mostly in ironing out little subtleties. 4 RR 152-53.

Tubb, in contrast, was the one with the relevant expertise in the munitions business. He appears to have done the bulk of the work on the product specifications and he also participated in the equipment preparation. 4 RR 98. 7 RR 51 (I have as much time invested as he does); 7 RR 67-68 (We both put in time). According to Rue Marshall, Tubb's involvement was "strong" on the development side of the project and also later on, respecting the mechanical side, to ensure the machine would be a versatile one and capable of handling different munitions types. 4 RR 152.

Even Sterling conceded Tubb's hands-on involvement, 4RR199-200, which didn't stop when the equipment was installed, but continued afterwards, when Tubb was fitting toolheads, refining the machine's sorting routine, and making pressure adjustments to the machine. 6 RR 14-15.

What is more, neither Sterling nor his wife could ever really say what it was Sterling did that allegedly took so many hours or quantify any concrete benefits he had created. Contractors did the real work on Sterling's garage conversion (primarily sheet rocking, insulating, electrical, and painting). 4 RR 100-01. The two-loader/one-controller concept which Sterling claims as his innovation was a tweak; it was not revolutionary. There doesn't appear any reason why the same production results could not have been accomplished with two independent loader/controllers. Nor is there any concrete evidence that it ushered any material savings in equipment, time, or otherwise.

Superior submits that the maximum sustainable recovery, if Sterling is to be awarded anything for his time, would not exceed $70/hour for twelve 40-hour work weeks—less than the $25,019 Sterling extorted through the payment of invoices.

## III. Aspect owes attorney's fees.

The district court has adjudicated Superior's right to the $35,019 paid on the prior invoices. But it has denied Superior the coordinate recovery of any attorney's fees. This is legal error.

Here, the parties' agreement called on Aspect to contribute its service invoices as capital. Everyone agrees on this. In breach of this agreement, Aspect required Superior to pay those invoices or else Sterling would not relinquish administrative rights over Superior's website. The district court has agreed Aspect had no basis for this conduct, and has awarded the $35,019 to Superior as an offset. 4 CR 468 (COL 7); 5 CR 168. This establishes Aspect's contract breach and Superior's right to an attorney's fee award as a matter of law.

Under Section 38.001 of the Texas Civil Practice and Remedies Code, a party is entitled to recover attorney's fees upon satisfying two requirements. It must (1) prevail on a fee-bearing claim (such as a claim for breach of a contract), and (2) recover damages. *See Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). Superior met both requirements.

To satisfy Section 38.001, it is not necessary to be the "net winner" or even to obtain a "net recovery." *See McKinley v. Drozd*, 685 s.W.2d 7, 10-11 (Tex. 1985). Nothing more is required than to recover an "amount of a valid claim" under a fee-bearing cause of action—even if that amount is entirely offset by the opponent's recoveries on other claims. *Id.*; *Thomas v. Bobby D. Assoc.*, 2008 WL 3020339, *2 (Tex. App.–Tyler 2008, no pet.)(mem.op.)

47

(claimant who recovers damages on a fee-bearing claim is a prevailing party entitled to an award of attorney's fees whether or not he obtains a net recovery); *G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 548 (Tex. App.–Dallas 2005, no pet.)(same).

This fee recovery was mandatory. "If attorney's fees are proper under § 38.001(8), the trial court has no discretion to deny them." *Smith v. Patrick W. Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009). Under Section 38.001, every successful contract claimant is entitled to recover the reasonable and necessary attorney's fees expended on the fee-bearing claim. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8).

## Conclusion and Prayer

For all the reasons stated above, the judgment below should be reversed, in part, and (a) judgment should be rendered in part that Aspect take nothing on its claims, (b) Superior's recovery of a refund for $35,019, constituting the previous payment of invoices, should be affirmed, and (c) the cause otherwise should be remanded for entry of an appropriate attorney's fee award in Superior's favor. Alternatively, the judgment should be reversed and

a remittitur suggested or, failing remittitur, a new trial granted. Superior of course also prays for all additional relief it may be entitled to receive.

Respectfully submitted,

   /s/ Greg Smith
Greg Smith
State Bar No. 18600600
RAMEY & FLOCK, P.C.
100 East Ferguson, Suite 500
Tyler, TX  75702
Telephone:  (903) 597-3301
Facsimile:   (903) 597-2413
**gsmith@rameyflock.com**

Wesley Hill
State Bar No. 24032294
WARD, SMITH & HILL, PLLC
P. O. Box 1231
Longview, TX  75606
Telephone:  (903) 757-6400
Facsimile:   (903) 757-2323
**wh@wsfirm.com**

**COUNSEL FOR APPELLANTS**

49

## Certificate of Service

The undersigned certifies that a copy of the above and foregoing document was served upon counsel for Appellees in accordance with the applicable Texas Rules of Civil Procedure on this the 8th day of June, 2015, on the following:

**keith@mkdlaw.us**
Keith Dollahite
M. Keith Dollahite, P.C.
5457 Donnybrook Ave.
Tyler, Texas 75703

**trey@yw-lawfirm.com**
Trey Yarbrough
Yarbrough Wilcox, PLLC
100 E. Ferguson, Suite 1015
Tyler, Texas 75702

_/s/ Greg Smith_____
Greg Smith

## Certificate of Compliance

1.	This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4 because it contains 10,106 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(2)(B).

2.	This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in the proportionally spaced typeface using Word Perfect X5 in 14 point Times New Roman font.

Dated: June 8, 2015.

   /s/ Greg Smith       

Greg Smith

No. 12-14-00323-CV

---

## In the Twelfth Court of Appeals
## Tyler, Texas

---

**DAVID TUBB AND SUPERIOR SHOOTING SYSTEM, INC.**

*Appellants*

**v.**

**ASPECT INTERNATIONAL, INC. AND JAMES STERLING**

*Appellees*

---

*Appealed from the 7th Judicial District Court*
*Smith County, Texas*

---

## APPENDICES

---

A. Findings of Fact and Conclusions of Law
(4 CR 452-68)

B. Final Judgment
(5 CR 168-70)

# APPENDIX A

# Findings of Fact
# and Conclusions of Law
# (4 CR 452-68)

CAUSE NO. 13-0367-A

| ASPECT INTERNATIONAL, INC. | § | IN TH~~ ~~ ~~RICT~~ |
| AND JAMES STERLING | § | |
| | § | |
| VS. | § | |
| | § | ~~ROGERS~~ |
| | § | ~~CLERK~~ ~~AND SMITH CO~~ ~~TX~~ ~~DEPUTY~~ |
| DAVID TUBB AND | § | ~~BY~~ |
| SUPERIOR SHOOTING SYSTEM, INC. | § | SMITH COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-styled and numbered cause came on for trial before the Court on April 23, 2014.

Plaintiffs are Aspect International, Inc. ("AII") and James Sterling ("Sterling"), and when applicable,

are collectively referred to as "Plaintiffs." Defendants are Superior Shooting System, Inc.

("Superior") and David Tubb ("Tubb"), and when applicable, are collectively referred to as

"Defendants." All of the parties and their attorneys were present on April 23, 2014 and announced

ready for trial. The trial commenced on April 23, 2014 and concluded on April 25, 2014.

After considering the pleadings, the sworn testimony and other evidence presented at trial,

argument of counsel, and the post-trial briefing, the Court took judicial notice of its file and heard

the parties evidence and makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Aspect International, Inc. ("Aspect") is a Texas corporation with its principal place

of business in Smith County, Texas. James Sterling ("Sterling") is an individual residing in Smith

County, Texas. James Sterling is the president of Aspect. Collectively, Aspect and Sterling are

referred to as "Plaintiffs."

2. Superior Shooting System, Inc. ("Superior") is a Texas corporation with its principal

place of business in Canadian, Hemphill County, Texas. David Tubb ("Tubb") is an individual

residing in Canadian, Hemphill County, Texas. David Tubb is the president of Superior. Collectively, Superior and Tubb are referred to as "Defendants."

3. At all times pertinent to this action, Sterling was authorized to speak and act on behalf of AII and Tubb was authorized to speak and act on behalf of Superior.

4. Sterling and Tubb were introduced to one another sometime in 2006 by an employee of Superior, Brandon Cole, who was or later became Superior's manager. The purpose of that introduction was to explore hiring Sterling to computerize Superior's sales and invoicing activities and the overall operation of the company.

5. The Court has jurisdiction over this suit because the amount in controversy exceeds this Court's minimum jurisdictional requirements. Venue is proper in Smith County under Tex. Civ. Prac. & Rem. Code § 15.002(a)(1) because a substantial part of the events or omissions giving rise to the claims occurred in Smith County, Texas.

6. Tubb is an accomplished long distance rifle shooter of some celebrity, having spent most of his life in and around the shooting industry. Tubb founded Superior on or about the year 2000 to manufacture and distribute shooting related products, including rifle and scope components, instructional videos, bore conditioning ammunition, and high precision ammunition.

7. Sterling was hired in 2006 by Tubb and Superior and over the next three to five years computerized Superior's sales operation and provided other IT consulting services, including the creation or upgrade of the company's website. Tubb testified that Sterling's services enhanced the overall operation of Superior and made the company more efficient. Tubb acknowledged that Sterling made Superior better than it was before and that he was "real helpful."

8. Sterling had access to Superior's computer network and the company's books, and was entrusted with a company credit card while performing the foregoing services. Tubb was not

aware of Sterling ever engaging in any unethical conduct or doing anything detrimental to the company during that period, and Sterling demonstrated competency in computers and information technology.

9. In the latter part of 2011, Sterling and Tubb discussed collaborating together to manufacture and sell small arms ammunition. As a result of those discussions, AII and Superior, through Sterling and Tubb respectively, entered into an agreement to manufacture and sell small arms ammunition ("the Agreement").

10. The material terms of the Agreement included:

 a. Superior's agreement to contribute the equipment and materials necessary for the enterprise's viability and success;

 b. Tubb's name, well-known in competitive shooting circles, would be used by the business for marketing purposes and Superior would market the products through its existing distributors;

 c. Aspect [AII] would be entrusted with the manufacturing operation of the business, and perform the labor and work necessary to bring the product to market; more specifically, AII, through Sterling, would use its computer and business skills to procure a manufacturing solution, coordinate the overall design and assembly of the loading equipment and operation, initially provide the location for the manufacturing operation and storage of materials, and oversee the manufacture and sale of the finished product.;

 d. Tyler, Texas would serve as the original location for the manufacturing operation;

 e. The parties would share equally in the profits of the enterprise;

f.       Tubb and Superior would assist with input in the design of the system and accuracy details for the high precision ammunition; and.

g.       Sterling would contribute his IT receivable owed to him by Superior in the amount of $35,019.00 to the venture.

11.     There was a considerable amount of evidence introduced at trial that AII substantially performed its obligations under the Agreement and would have fully performed but for the breach and repudiation of the Agreement by Superior found by the Court below.

12.     During the course of their dealings and in sworn testimony, Superior and Aspect expressed the general intent to be "partners" in the business venture.

13.     However, neither Plaintiffs or Defendants executed any form of written agreements.

14.     Neither Plaintiffs or Defendants executed any form of written joint venture or partnership agreements.

15.     Neither Plaintiffs or Defendants executed any form of written documents to incorporate the proposed new business as a corporation or limited liability company.

16.     Neither Plaintiffs or Defendants filed any U.S. tax returns for the proposed new business.

17.     Neither Plaintiffs or Defendants filed any applications to obtain a  U.S. tax identification number for the proposed new business.

18.     No new bank account was set up for the venture, rather Plaintiffs and Defendants each paid for items individually.

19.     The evidence demonstrated, among other things, that AII, through Sterling, researched and procured the manufacturer for the ammunition loading equipment which would be used for the

new enterprise and serve as the "heart" of the manufacturing operation. The manufacturer procured was FillPro, an engineering firm with extensive experience in powder delivery systems.

20.     Working with FillPro, Sterling came up with the idea and brought to fruition a hybrid computer-controlled loading system, using existing loading hardware but with a computer system designed around it that would make the machine capable of high volume production and precision loading capabilities.

21.     Over the course of a year, Sterling engaged with FillPro's engineers on virtually a daily basis, working with them on every stage of the project, including, among other things, participation in the design requirements of the software, sensor placement, safety and design issues relevant to the ammunition industry, accuracy requirements demanded by Tubb, and workflow design based on Aspect's facility in Tyler. There was considerable evidence, including photograph exhibits, demonstrating the work that went into preparing the Tyler facility to make it environmentally sound and stable, and conducive to the operation of the loading equipment.

22.     During that same year, 2012, Sterling lined up suppliers for the components necessary to start production, undertook a cost analysis to determine the cost of goods, and conducted market research for the different types of calibers of ammunition to be sold.

23.     Sterling also prepared an initial business plan, which included calculations of certain overhead costs and projections based on his experience with loading equipment and their cyclic rate of output. He researched distribution logistics and distributor margins, shipping and DOT regulations, item bar code and registration requirements. The evidence showed that Sterling stayed abreast of the business and political climate and government-related issues that might affect supply and demand issues for the anticipated business.

24. AII came up with the idea for the "Absolute" brand for the ammunition product, and formulated the package design in which the cartridges would be packaged and sold.

25. Rue Marshall ("Marshall"), an employee of Fillpro, testified that Sterling did the work that would normally be performed by a committee of persons, each delegated with a different set of tasks. Tubb acknowledged in recorded telephone calls introduced into evidence that Sterling invested a lot of time in getting the enterprise ready for business.

26. Superior funded the purchase of the ammunition loading equipment and a limited amount of materials (primers, powder, cartridges, and bullets) for the enterprise, as part of its obligation under the Agreement. Superior acquired manufacturing equipment and materials in its name in an amount totaling at least $230,000.00. This property was acquired without any indication of Superior's capacity as a partner and with Superior's funds, not funds of any venture or partnership or other legal entity. Aspect prepared a garage at James Sterling's residence to serve as the initial manufacturing location and same was improved by Plaintiffs' funds and efforts. Both Tubb and Sterling contributed time and efforts to the design, acquisition and setup of the equipment and materials for the manufacturing joint venture.

27. In October 2012, the ammunition loading machine (after it was completed and ready for production use) was transported by Fillpro to the facility prepared by AII in Tyler, Texas, where it was installed by Marshall. Marshall, who the evidence showed to have extensive experience in powder loading equipment, including such equipment used in the munitions industry, spent several days at the Tyler facility training Sterling on the equipment and certifying the equipment as "production-ready." FillPro had actually load-tested the machine at their facility in Colorado before shipping it to Texas.

28.    Tubb never traveled to Tyler, Texas to see the AII production facility prior to the installation of the equipment.

29.    Tubb and Sterling both traveled to Colorado to the FillPro facility to review their machines, design options and discuss requirements.

30.    Sterling and Tubb planned for Tubb to make a visit to the facility in Tyler in November to examine the loading machine and add some dyes for a particular caliber of ammunition. Beginning shortly prior to the trip to Tyler and continuing thereafter, a series of actions and events occurred, which, considered together, constitute a breach and repudiation of the Agreement by Superior.

31.    Just before the November 2012 trip to Tyler, Sterling received a call from Tubb questioning the amount of contributions of money and property that the Defendants had made to the enterprise. The call caused Sterling enough concern that he emailed Tubb on November 8, 2012, raising his concern and advising Tubb that if there was going to be a change in the Agreement, the parties needed to discuss it before the trip. Tubb followed up with a call, telling Sterling that there would be no change in the Agreement since Sterling would be doing all the work.

32.    Tubb announced over a dinner during the November 2012 trip, with the Sterlings and other witnesses present, that his son, Cannon Tubb, should be the one to run the manufacturing operation of the business; something that caught others around the table by surprise and was contrary to a material term of the Agreement.

33.    The next morning Tubb advised Sterling that the manufacturing equipment and operation would need to be moved to Canadian, a position in conflict with the parties' Agreement that the operation would be located in Tyler, Texas and run by AII. Although Tubb relented on an immediate removal, he advised Sterling that the equipment and operation would eventually be

moved to Canadian, Texas. This position constituted a breach of a material term of the Agreement between the parties, as it would remove AII as manufacturer, since AII was based in Tyler, TX.

34. There was evidence introduced of communications during the November trip between Tubb's wife, Sue Tubb, and Superior's accountant, Marilyn Ault, which appeared to call into question Sterling's integrity and other material terms the parties had agreed upon. Sue Tubb likened the situation to Defendants' former business partner and company manager, Brandon Cole, which ended in litigation and a dissolution of their business relationship, expressing concern as to whether her husband would again be "taken advantage of." Ault expressed the belief that the Agreement regarding how the revenues would be shared was not right.

35. The November 2012 trip was followed by a series of actions which, individually, or in combination with other actions, constituted a breach and confirmed Superior's repudiation of the parties' Agreement: Defendants' refusal to secure and provide the additional materials necessary to make the venture successful, and Tubb's resistance to memorialize the Agreement in writing.

36. Tubb claimed that he could not get additional bullet feeders that would be used in the manufacturing operation, but when Sterling looked into it, he discovered that the equipment was readily available. In an exchange between the two men, Tubb told Sterling he will solicit from one of his suppliers at the next trade show additional materials, but then told the supplier at the show no additional brass is needed. Defendants did not provide the bullets needed to bring the final product to market. The 18,000 bullets that were at AII's facility were removed by Superior personnel, transported to Canadian and never returned. It was later determined that the bullets, which per the agreement were to be sold by the enterprise, were being sold by Tubb's company, DTAC. This refusal to provide the necessary materials constituted a breach of the Agreement.

37. In reliance upon the representations and agreements made by Defendants, AII and its president, James Sterling, devoted their time, skill, knowledge, and energies to the enterprise and its successful completion over the course of a year. AII at all times fully or substantially performed its obligations and agreements. To the extent that AII was unable to perform bringing the ammunition product to market, the evidence demonstrated that such inability was caused by acts or failures to act by Superior, through its president, Tubb.

38. Sterling and Marshall testified that the production capabilities of the machine demonstrated in the video admitted into evidence were reliable and valid. Marshall testified that what was demonstrated on the video was well within the machine's production capabilities. The video identified a production capability, assuming the production of one caliber, of 1200 rounds per hour, 9600 rounds per 8 hour shift, and an annual production 2,496,000 rounds, further assuming the machine was running only 260 days per year. There was evidence introduced at trial that ammo loading machines in the munitions industry often run 24 hours per day and, with the exception of maintenance or repairs, 365 days per year.

39. Sterling testified that the business, if successful, could have generated in the first year of production a profit of $4,321,768, the figure set forth in the column identified as FY 2012 on page 18 of Plaintiffs' Exhibit 2. However, as a result of no production and no sales of product at all, such projection is aspirational and not supported by evidence and is speculative.

40. The Court finds that lost profits cannot be established with reasonable certainty as a proper measure of damages as stated above. Sterling provided oral and documentary evidence of AII's alleged restitution damages. Sterling testified that he was familiar with the reasonable value of his services provided, and further testified that a reasonable hourly rate is $140. In 2013, Plaintiffs prepared Invoices from October 31, 2011 thought January 19, 2013 claiming a rate of

$22,400.00 each month for 40 plus hour work weeks at the $140 per hour rate. Sterling testified that the reasonable value of AII's services is $326,974.20. However, Defendants introduced the AII IRS Form 1120 showing total corporate income for the following years: 2010 – $0; [DX-15]; 2011 – $194; [DX-14]; and 2012 – $8,246 [DX-13]. Neither party introduced any evidence of Sterling's individual prior year tax returns or Form 1099 or W-2 to establish prior years individual earnings or lack thereof. However, the Court finds that AII sustained restitution damages in the amount of $175,000.00.

41. Under the "totality of circumstances" test set forth by the Texas Supreme Court in *Ingram v. Deere,* 288 S.W.3d 886, 900 (Tex. 2009) and the factors delineated in Tex Bus. Org. Code § 152.052, the Court finds that the parties did not create a partnership.

42. Both Sterling and Tubb agreed to share the profits equally.

43. Sterling and Tubb apparently never contemplated any losses and therefore never agreed to share the losses or liabilities in any fashion.

44. Both Sterling and Tubb agreed to "go into business together" on the ammunition project, but it is clear they had no agreement as to the form of entity [i.e. joint venture, partnership, limited partnership, limited liability company, corporation, etc.] as same continued to be discussed right up to through the filing of the lawsuit.

45. Tubb and Superior held and provided the "checkbook" and therefore all the rights to control the business and right to make the executive decisions.

46. Both Sterling and Tubb contributed property to the venture.

47. As a result of the Defendants' conduct, Plaintiffs have been required to retain the services of attorneys for the filing, prosecution and trial of this cause, and are entitled to an award of reasonable and necessary attorney's fees.

48.   On or about January 7, 2013, Sterling made demand upon Superior for payment of the $35,019.00 in account receivables he had contributed to the venture and Defendants paid same.

49.   On February 6, 2013, Aspect filed this suit against Defendants.

50.   Upon learning of the filing of this lawsuit in February 2013, Superior made demand upon Plaintiffs for the return of the manufacturing equipment and materials Superior had purchased. Plaintiffs initially indicated Superior's property would be returned, but then refused the return citing the advice of counsel. Defendants made a subsequent formal written demand for the return of Superior's property on or about April 12, 2013. [DX-26]. Despite these demands for return of Superior's property, Plaintiffs continued to hold Superior's property during the litigation, only releasing it on February 27, 2014, shortly before trial. [PX-80]. The property, having an approximate original purchase value of $230,000.00.

51.   After learning of the lawsuit, Superior hired Jonathan Thornton with Thornton Research, LLC, ("Thornton") a licensed private investigator, to perform a background investigation on James Sterling. Superior had been considering the background investigation, at the urging of Sue Tubb, before the lawsuit because of its legitimate business need for information regarding Sterling considering the significant financial investment Sterling had solicited from Superior.

52.   Thornton advertises on its website that it performs all investigations in conformance with applicable laws and regulations. Thornton performed the background check on Sterling using publicly available sources and data bases he subscribes to as an investigator. Thornton, not Superior, chose the manner and means of the investigation. Superior provided Thornton only Sterling's name, business address, and Aspect's web address, and requested a background investigation. No person intruded physically onto Sterling's property or business, engaged in any type of surreptitious

recording or videotaping, or opened mail or intercepted communications intended for Sterling. The investigation report was never disclosed to any third party outside lawful discovery in the lawsuit.

53. As part of the investigation, Thornton chose to obtain a TransUnion consumer credit report regarding James Sterling. Superior had a legitimate business need for the information Thornton obtained in the investigation because of the business transaction initiated by Sterling and its investment.

54. Superior never expressly authorized Thornton to obtain the consumer credit report, no employer-employee or other respondeat superior relationship existed between Superior and Thornton, and Superior took no action to hold Thornton out to a third party as possessing authority to act on Superior's behalf.

55. The background investigation revealed several facts about Sterling. First, the investigation revealed that Sterling had pleaded guilty in 1983, at the approximate age of 34, to the felony charge of unauthorized use of a motor vehicle, under his given name Michael Patton. Sterling was sentenced for 4 years confinement in the Texas Department of Criminal Justice, probated. Sterling served approximately 18 months of this probation before requesting that the probation be terminated early and having the charge and indictment dismissed. Approximately one month after his felony guilty plea in 1983, Sterling changed his name from Michael Patton to James Sterling. Second, the investigation revealed that Thornton filed personal bankruptcy in 1996, being discharged in 1997. This publicly available bankruptcy filing reflects Sterling's personal identifying information, including his social security number.

56. The trial evidence also established the following facts;

    a. Sterling's employment history consists of:

        i. Less than 2 years as a border patrol agent in the mid-1970's; and

ii. Less than a year as an intern with a company Sterling calls Welling & Associates, also during his mid-20's. Sterling cannot recall how much he was paid or whether paid hourly or salary;

iii. One year with Hertz Equipment Rental and Leasing Corp. in the early 1980's where Sterling claims to have created the leasing division and the marketing and sales departments of Hertz, despite acknowledging that the company had been in business world-wide for decades before his employment, that he had no more than a high school education at the time, and his tenure was one year or less;

iv. Six months working for a contractor through which he did IT services work for Bank of American in 1999. As a result of this work, Sterling presented several reference letters to Tubb that create the impression he was actually employed by Bank of America in an attempt to allay concerns Tubb had about Sterling's reliability.

v. One year working for Unisys as an IT project manager in approximately 2000. Sterling isn't sure whether he quit or was fired, but the employment ended in connection with a civil suit Sterling filed against Unisys alleging violations of the Americans with Disabilities Act.

b. Sterling's past business experience consists of:

i. A project in the late 1970's Sterling referred to as Transpacific Investments. Sterling claims to have acquired an option to purchase the Lough Rynn Castle in Ireland from the Howard Hughes estate for

$1.00. The claimed investment failed and nothing came of it according to Sterling.

ii. A wholesale/retail computer hardware company in the early 1980's that Sterling called Micro Design System. Sterling says the business lasted approximately 2 years before he dissolved it.

iii. A property tax consulting company Sterling claims to have attempted in 1989 called Sterling & Associates. The attempt lasted less than a year and Sterling says he wasn't very much involved in it.

iv. Some period of years engaging in agricultural or ranch related work on his then 115 acre homestead in Smith County in the 2000's.

c. Sterling receives disability insurance payments from the Hartford, though he claims he does not know whether he is considered totally and permanently disabled. Sterling was on disability prior to entering the venture with Defendants and over the course of the 14 months when he claims to have worked in excess of 8-12 hours daily setting up and preparing the manufacturing endeavor that he claimed he would and could operate.

d. Aspect has never had any other clients, business, or revenue of any sort beyond that derived from Superior and Tubb. The business is not a going concern.

e. Plaintiffs have no experience with government contracting, have never had a government contract, lacked the necessary federal firearms license to manufacture ammunition, and lacked a CAGE code required to bid for government contacts at all times relevant to the joint venture.

f.  Sterling has had no personal income from employment or other business sources, apart from Superior, for at least the past ten years.

g.  Sterling' educational background consists of a high school diploma. The presence or absence of a high school diploma usually is not relevant to the issues in a trial. However, in a case where the Plaintiff identifies himself as an expert on complex damage calculations, the expert's level of education in the field of alleged expertise is highly relevant. Sterling states that he has attended some college courses, but could not provide any reliable estimate of college hours he has completed. He has no college degrees and no professional certifications or training with regard to accounting, economics, lost profits calculations, business, marketing, mathematics, engineering, or other relevant commercial endeavors.

57.  Plaintiffs have failed to show any credible evidence of a representation of a material fact by Defendants that Defendants knew to be false when made or about which Defendants were reckless as to its truth, that Plaintiffs reasonably relied upon any such representation to Plaintiffs' detriment, or any proven or credible damages resulting therefrom.

58.  Plaintiffs have failed to show any credible evidence of an improper use or false pretenses, neither willfully nor negligently, for purposes of the Fair Credit Reporting Act, that Plaintiffs' suffered any actual damages or that any alleged damages are causally connected to any act by Defendants.

59.  Though Plaintiffs have proven no credible facts showing an actionable intrusion onto seclusion or violation of the FCRA, nor any credible damages for either, responsibility for Sterling's

claimed but unproven harm are assigned as follows: 50% Thornton, 50% Defendants, 0% Plaintiffs. Thornton has been properly designated as a responsible third party.

60. Defendants did not establish by a preponderance of the evidence that Plaintiffs converted the equipment and materials made the subject of this suit.

61. Plaintiffs relinquished the subject equipment and materials to Defendants and Defendants signed a receipt which was introduced into evidence, confirming the return of the equipment and materials.

62. There is no evidence that Defendants sustained any damages with respect to AII's possession of the equipment and materials, but that the equipment had greater value when it was relinquished to Defendants than the sum total of the parts purchased as Plaintiffs had the equipment "production ready" waiting on the component ammunition parts. Defendants merely had said equipment in storage at time of trial and was not using same for production of ammunition.

## CONCLUSIONS OF LAW

1. Superior is liable in damages to AII for breach of contract.

2. Plaintiffs and Defendants did not form a partnership under Texas law governed by the Texas Business Organizations Code.

3. Plaintiff AII is awarded damages against Defendant Superior in the amount of $175,000.00.

4. Plaintiffs are entitled to recover attorney's fees under Tex. Civ. Prac. & Rem. Code §38.001.

5. Plaintiffs are entitled to recover costs and pre-judgment and post-judgment interest.

6. Defendants take nothing as to their claims of fraud, conversion and breach of contract.

7.     Superior is entitled to offset on Plaintiffs' above damages in the amount of $35,019.00, [DX-27].

8.     Defendants are not entitled to attorney's fees.

SIGNED this 17th day of June, 2014.

HONORABLE KERRY L. RUSSELL
PRESIDING JUDGE, 7TH DISTRICT COURT
SMITH COUNTY, TEXAS

# APPENDIX B

# Final Judgment
# (5 CR 168-70)

CAUSE NO. 13-0367-A

FILED
LOIS ROGERS
DISTRICT CLERK

2014 AUG -6 PM 4: 10

BY_____

| | | |
|---|---|---|
| ASPECT INTERNATIONAL, INC. | § | IN THE DISTRICT COURT |
| AND JAMES STERLING, | § | SMITH COUNTY, TEXAS |
| | § | |
| VS. | § | SMITH COUNTY, TEXAS |
| | § | |
| DAVID TUBB AND | § | |
| SUPERIOR SHOOTING SYSTEM, INC. | § | 7th JUDICIAL DISTRICT |

## FINAL JUDGMENT

The above-styled and numbered cause came on for trial before the Court on April 23, 2014.

Plaintiffs are Aspect International, Inc. ("AII") and James Sterling ("Sterling"), and when applicable, are collectively referred to as "Plaintiffs." Defendants are Superior Shooting System, Inc. ("Superior") and David Tubb ("Tubb"), and when applicable, are collectively referred to as "Defendants." All of the parties and their attorneys were present on April 23 and announced ready for trial. The trial commenced on April 23 and concluded on April 25, 2014.

After considering the pleadings, the sworn testimony and other evidence presented at trial, argument of counsel, and the post-trial briefing, the Court took judicial notice of its file and heard the parties evidence and filed Findings of Fact and Conclusions of Law (on June 18, 2014) and same are incorporated herein by reference at this time. Having done so, the Court enters judgment as follows:

1.  Plaintiff, Aspect International , Inc. ("Aspect"), have and recover from Defendant, Superior Shooting System, Inc. ("Superior"), as follows:    a) Actual damages in the amount of $139,981.00, [constituting a gross recovery of $175,000.00 less an offset of $35,019.00];    b) Pre-judgment interest on the foregoing actual damages of $139,981.00 at an annual rate of 5% from February 6, 2013, until the day before entry of this final judgment; c) Reasonable and necessary

attorney's fees and expenses through trial and the post-trial submissions of the parties in the amount of $ 111,764.80 [as segregated by the Court pursuant to Defendant's Objections contained within Defendant's Response in Opposition to Plaintiff's Motion for Attorney's Fees (filed July 18, 2014)] and d) Taxable court costs.

2. As to the disputed attorney fee issue between the parties, the Court considered the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. See <u>McCalla vs. Ski River Development, Inc.</u>, 239 S.W.3d 374 (Tex. App. - Waco, 2007; no writ).

3. The total amount of the Judgment shall bear post-judgment interest at the rate of 5% per annum, compounded annually, from the date this judgment is entered until all amounts are paid in full.

4. The Court further orders that if Defendant Superior unsuccessfully appeals this judgment to an intermediate court of appeals, Plaintiff Aspect will additionally recover from Defendant the amount of $30,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff in successfully defending the said appeal.

5. The Court further orders that if Defendant Superior seeks review of this judgment to the Texas Supreme Court, Plaintiff Aspect will additionally recover from Defendant the amount of $ 20,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff for preparing or responding to a Petition for Review in the Texas Supreme Court if Plaintiffs prevail in whole or in part.

6. The Court further orders that if Defendant Superior seeks review of this judgment to the Texas Supreme Court and the Petition for Review is granted, Plaintiff Aspect will additionally

recover from Defendant the amount of $ 15,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff for preparing or responding to a brief on the merits in the Texas Supreme Court, conditioned on Plaintiffs prevailing in whole or in part.

7.    The Court further orders that Plaintiff James Sterling take nothing with regard to his individual claims against Defendants.

8.    The Court further orders that Defendants Superior Shooting System, Inc. and David Tubb take nothing with regard to their claims against Plaintiffs.

9.    All writs and processes for the enforcement and collection of this judgment and the costs of Court shall issue as necessary.

All relief not expressly granted herein is denied.

This judgment is final, disposes of all claims and parties, and is appealable.

**SIGNED this 6th day of August, 2014.**

_____
HONORABLE KERRY L. RUSSELL
JUDGE PRESIDING